

U.S. Department of Justice

Matthew M. Graves
United States Attorney

*District of Columbia*

---

*Patrick Henry Building*
*601 D St., N.W.*
*Washington, D.C. 20530*

December 28, 2023

Ed Wilson, Esq.
Terrence G. Reed
V. Thomas Lankford
Lankford & Reed PLLC
120 N St Asaph St.
Alexandria, VA 22314

<u>VIA ELECTRONIC MAIL</u>

      Re:    *United States v. Barry P. Bennett*

Dear Counsel:

      With this letter, I am conveying the details of the government's offer of a Deferred Prosecution Agreement ("DPA" or "Agreement") to your client, Barry P. Bennett ("your client"), in connection with an investigation into your client's role in creating and overseeing an entity known as Yemen Watch, LLC, also known as Yemen Crisis Watch ("YCW"). The government has determined that the interests of the United States and the public, as well as your client's interests, will be best served by deferring prosecution of this case.

<u>**Criminal Information and Acceptance of Responsibility**</u>

      Your client acknowledges and agrees that the U.S. Attorney's Office for the District of Columbia and the National Security Division of the U.S. Department of Justice (collectively, "the Office") will file the attached two-count criminal Information in the U.S. District Court for the District of Columbia, charging your client with Scheme to Falsify, Conceal, and Cover up Material Facts from DOJ's FARA Unit, in violation of 18 U.S.C. § 1001(a)(1); and False Statements and Material Omissions in Filings Under the Foreign Agents Registration Act ("FARA"), in violation of 22 U.S.C. §§ 612 and 618(a)(2). In so doing, your client: (a) knowingly waives his right to indictment on these charges, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the U.S. Constitution, 18 U.S.C. §§ 3161-3174, and Federal Rule of Criminal Procedure 48(b);

and (b) knowingly waives, for purposes of this Agreement and for the purpose of any charges by the United States arising out of the conduct described in the attached Statement of Facts, any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the U.S. District Court for the District of Columbia.

Your client admits, accepts, and acknowledges that he is responsible under U.S. law as charged in the Information and as set forth in the Statement of Facts attached hereto as Exhibit A and incorporated by reference into this DPA, and that the allegations described in the Information and the facts described in Exhibit A are true and accurate. Should the Office pursue the prosecution that is deferred by this Agreement, your client stipulates to the admissibility of the Statement of Facts in any proceeding, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the Statement of Facts at any such proceeding.

## Payment of Monetary Penalty

The Office and your client agree that, based on the factors set forth in 18 U.S.C. § 3572(a), and 18 U.S.C. § 3571(d), a fine of $100,000 is an appropriate fine in this case. Your client agrees to pay a fine in the amount of $100,000 to the U.S. Treasury based on the following payment schedule: $5,555.56 per month on the first of the month, on acceptance of this Agreement. Your client and the Office agree that this fine is appropriate given the facts and circumstances of this case, including the nature and seriousness of your client's conduct. The $100,000 is final and shall not be refunded. Your client shall pay the fine plus any associated transfer fees according to the payment schedule pursuant to payment instructions provided by the Office in its sole discretion.

## Conditional Release from Liability

Subject to the terms of this DPA, the Office agrees that, except as provided in this Agreement, it will not bring any criminal or civil case against your client relating to any of the conduct described in the Statement of Facts, attached hereto as Exhibit A, or the Information filed pursuant to this Agreement. The Office, however, may use any information related to the conduct described in Exhibit A against your client: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code. This DPA does not provide any protection against prosecution for any future conduct by your client.

3

**Deferred Prosecution**

By signing this Agreement, your client admits to the conduct described in the Statement of Facts attached hereto as Exhibit A, agrees that the government could prove that the conduct violated the provisions of the statutes, and acknowledges responsibility for his conduct. The period of deferred prosecution may be administered under the supervision of the U.S. Pretrial Services Agency ("Pretrial Services") and an assigned Pretrial Services Officer. Once this Agreement is executed by all parties, the Office agrees that prosecution of your client shall be deferred for a period of 18 months from the date the Court imposes the agreed-upon conditions of pretrial release, subject to the terms below, and provided your client abides by all the conditions of this DPA.

Once approved by the Court, the conditions listed here may be altered by consent of the parties, with approval by the Court.

**Conditions of Deferred Prosecution**

By signing this DPA, your client agrees to be bound by its conditions of deferred prosecution. Specifically, your client shall:

- Not engage in any conduct that would require registration under FARA, 22 U.S.C. §§ 611-618 for a period not to exceed 18 months from the date the parties sign this Agreement;

- Cause Avenue Strategies Global LLC to correct its September 2017 and March 2018 FARA filings based on instructions provided by the Office;

- Pay the Fine Amount pursuant to the schedule detailed above; and

- Comply with the terms of the Court's Order of Release.

If, upon completion of your client's period of deferred prosecution, the Office verifies that your client has complied with all the conditions of deferred prosecution set forth above, the Office will move to dismiss the Information with prejudice within two months of receiving this report. The Office further agrees not to file charges in the future against your client based on the conduct described in this Agreement, the Information, and Exhibit A.

In the District of Columbia, Pretrial Services is located at 633 Indiana Avenue, N.W., Suite 120, Washington, D.C. 20004-2902. Your client's supervision may be supervised by a Pretrial Services office in Virginia. By executing this Deferred Prosecution Agreement, your client acknowledges that supervision of his period of deferred prosecution may be transferred to another Judicial District and/or Branch Office of Pretrial Services.

4

**Breach of Agreement**

Should your client violate any of the conditions of this DPA, the Office may at any time: (1) revoke or modify any of the conditions of deferred prosecution; (2) lengthen the period of deferred prosecution; and/or (3) terminate deferred prosecution and reinitiate prosecution of this case. Any decision to revoke, modify, lengthen, or terminate deferred prosecution rests solely with the Office in its exclusive discretion. At the time the Office makes any such decision, it will furnish counsel for your client with written notice specifying the condition(s) of deferred prosecution that your client has violated and the reasons why deferred prosecution is being revoked, modified, lengthened, or terminated.

Your client understands that in the event he fails to comply with the terms of the deferred prosecution agreement, in any prosecution that is deferred by this Agreement, the government may offer all or part of the factual statements set forth above and in the attached Statement of Facts at any stage of the criminal proceeding for any purpose. Your client agrees that he shall assert no claim under the U.S. Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that such statement should be suppressed or is inadmissible. Your client understands that he is waiving any and all rights in the foregoing respects.

Should prosecution of your client for the charged offenses in this case be reinitiated by the Office, your client agrees that any period of delay in prosecution occasioned by this DPA shall be excluded from consideration as to any rights your client may have to a speedy indictment under the Sixth Amendment to the U.S. Constitution, the Speedy Trial Act (18 U.S.C. §§ 3161-3174),[1] the Federal Rules of Criminal Procedure (including Rule 48(b)), and/or the applicable statute of limitations. Any such prosecution relating to the conduct described in Exhibit A or relating to conduct known to the Office before this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against your client, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the end of its term (including an extensions), plus 90 days. By signing this Agreement, your client agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for a period equal to the term of this Agreement (including any extensions), plus 90 days.

Your client acknowledges that the Office has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if your client breaches this Agreement and this matter proceeds to prosecution, judgment, and sentencing. Your client further

---

[1] The exclusion of time from any Speedy Trial Act calculations due to a deferred prosecution agreement is authorized by 18 U.S.C. § 3161(h)(2), which authorizes the exclusion of time when prosecution is delayed by the government pursuant to a written agreement with a defendant, with the approval of the Court, for the purpose of allowing the defendant to demonstrate his or her good conduct. *See United States v. Fokker Servs. B.V.*, 818 F.3d 733, 738 (D.C. Cir. 2016). Your client agrees to join in the government's motion for an exclusion of time under the Speedy Trial Act, 18 U.S.C. §§ 3161(h)(2) & (h)(7)(A).

acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

## Public Statements

Your client agrees that he shall not, through present or future attorneys, agents, or any other person authorized to speak for your client make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by your client set forth above or the facts described in Exhibit A. Any such contradictory statement shall constitute a breach of this Agreement, and your client shall then be subject to prosecution as set forth in this Agreement. If the Office determines that a public statement by your client, or by any person authorized to speak for your client, contradicts in whole or in part a statement contained in Exhibit A, the Office shall so notify your client, and your client may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification.

Your client agrees that if he issues a press release or holds any press conference in connection with this Agreement, your client shall first consult with the Office to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Office and your client; and (b) whether the Office has any objection to the release. Statements at any press conference concerning this matter shall not be inconsistent with such a press release.

**Complete Agreement**

       This Agreement sets forth all the terms of the agreement between your client and the Office. This Deferred Prosecution Agreement will be effective only upon signature of the undersigned Assistant United States Attorney, Department of Justice Trial Attorney, your client, and your client's counsel, and on approval by the Court of the agreed-upon terms of pretrial release.

                             Sincerely,

                             MATTHEW M. GRAVES
                             UNITED STATES ATTORNEY

By:     */s/JOLIE F. ZIMMERMAN*
            JOLIE F. ZIMMERMAN
            Assistant United States Attorney
            United States Attorney's Office
            601 D Street, NW
            Washington, D.C. 20530
            (202) 252-7220
            Jolie.Zimmerman@usdoj.gov

            MATTHEW G. OLSEN
            ASSISTANT ATTORNEY GENERAL
            FOR NATIONAL SECURITY

By:     */s/EVAN N. TURGEON*
            EVAN N. TURGEON
            Chief, Foreign Agents Registration Act Unit
            Counterintelligence and Export Control
            Section
            Department of Justice
            National Security Division
            950 Pennsylvania Avenue, NW
            Washington, D.C. 20530
            (202) 353-0176
            evan.turgeon@usdoj.gov

<u>ACCEPTANCE</u>

I, Barry P. Bennett, have read this Deferred Prosecution Agreement and have carefully reviewed it with my attorneys. I understand it, and I voluntarily, knowingly, and willfully agree to it, as well as to the conditions of my deferred prosecution, without force, threat, or coercion. No other promises or inducements have been made to me other than those contained in this letter. I am satisfied with the representation of my attorneys in this matter.

_____
Barry P. Bennett

12'26'23
Date

<u>ATTORNEY'S ACKNOWLEDGMENT</u>

I, D.E. Wilson, Esquire, have carefully discussed every part of this Deferred Prosecution Agreement with my client, Barry P. Bennett. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Dec. 28, 2023
_____
Date

D. E. Wilson, Jr.
_____
D.E. Wilson, Jr.
Attorney for Avenue Strategies, LLC, and
Avenue Strategies Global, LLC

I, V. Thomas Lankford, Esquire, have carefully discussed every part of this Deferred Prosecution Agreement with my client, Barry P. Bennett. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

12 - 28 - 23
_____
Date

_____
V. Thomas Lankford
Attorney for Barry P. Bennett

8

**ATTACHMENT A**

**STATEMENT OF FACTS**

At all relevant times, except as otherwise noted:

**Introduction**

1.      Defendant BARRY P. BENNETT ("BENNETT") was a United States citizen who resided in Virginia.

2.      DOUGLAS WATTS ("WATTS") was a United States citizen who resided in New Jersey.

3.      Avenue Strategies was a lobbying and consulting firm owned and run by BENNETT that operated through several legal entities, including Avenue Strategies Global, LLC.

4.      Company A, referred to as "[Country C] Watch" and "[Country C] Crisis Watch," was an entity registered as a Delaware Limited Liability Company ("LLC") in September 2017. Company A ceased operations in or around January 2018 and was dissolved in or around May 2018. WATTS founded Company A and was the sole member listed on its LLC Declaration.

5.      In July 2017, Avenue Strategies entered into a contract to perform lobbying work for Country A; the contract was signed by BENNETT. Avenue Strategies, BENNETT, and others working on the contract for Country A registered with the Attorney General, as required by the Foreign Agents Registration Act ("FARA"), 22 U.S.C. §§ 611-618.

6.      As part of his lobbying strategy on behalf of Country A and for and in the interest of Country A, BENNETT covertly operated Company A. As directed by BENNETT and managed by WATTS, Company A ran a public relations campaign designed to cast one of Country A's rivals, Country B, in a negative light for its conduct, and thereby to improve Country A's standing with the U.S. government relative to this rival.

7.      Company A was founded and operated by WATTS, and was funded solely with funds that Avenue Strategies received from its contract with Country A. Country A paid Avenue Strategies approximately $2.1 million between September 2017 and December 2017 for lobbying services, and approximately 27% of those funds (*i.e.*, approximately $773,000) financed the operations of Company A.

8.      While Company A was operational—from approximately September 2017 to January 2018—it engaged in a social media campaign, published opinion articles in newspapers, produced a documentary that was distributed through a national television network, distributed flyers, sent direct mailings to American citizens, and lobbied Congress and former President Trump. Among other things, Company A encouraged American citizens to contact lawmakers and urge them to cease supporting Country B's intervention in Country C.

9.      Neither WATTS nor Company A registered with the Attorney General under FARA.

10.     Avenue Strategies' FARA filings were authored by Law Firm A and approved by BENNETT. At BENNETT's request, Law Firm A formed Company A and acted as its counsel. As discussed below, BENNETT also introduced a Law Firm A partner to WATTS and stated that WATTS would be the owner of Company A. After Company A's formation, Avenue Strategies continued to pay Law Firm A for legal work related to Company A.

11.     Avenue Strategies' FARA filings failed to disclose the creation of Company A, Avenue Strategies' and BENNETT's affiliation with Company A, Avenue Strategies' disbursements to Company A, WATTS's work on behalf of Company A and Country A, or any of Company A's FARA-registrable activities. This information was required to be included in Avenue Strategies' FARA filings because WATTS's and Company A's activities were for and in

10

the interests of Country A and did not qualify for any applicable exemption from registration. In

particular, WATTS's and Company A's activities on behalf of Country A did not qualify for

FARA's humanitarian exemption because WATTS and Company A were not engaged "*only* ... in

the soliciting or collecting of funds and contributions within the United States to be used *only* for

medical aid and assistance, or for food and clothing to relieve human suffering." 22 U.S.C. §

613(d)(3) (emphasis added). Rather, the primary purpose of the Company A campaign was to

benefit Country A by raising awareness of the humanitarian crisis in Country C. The omissions in

Avenue Strategies' FARA filings thwarted FARA's disclosure requirements (as described below

in paragraphs 12 and 13).

## The Foreign Agents Registration Act

12.     The purpose of FARA is to prevent covert influence by foreign principals.

Registrations and disclosures under FARA allow the U.S. government and the American people

to evaluate the statements and activities of individuals who are serving as agents of foreign

principals in light of their status as foreign agents. Among other things, registration documents

that are required to be filed under FARA reveal the identity of the foreign principal on whose

behalf a registrant performs services, the type of services the registrant provides the foreign

principal, and the source and amount of compensation the registrant receives from the foreign

principal. FARA registration documents are filed with the Department of Justice's FARA

Registration Unit (the "FARA Unit") in Washington, D.C. The FARA Unit publishes these

documents on its publicly available website, www.fara.gov.

13.     In addition, FARA imposes ongoing disclosure requirements on registrants. Every

six months, registrants are required to make supplemental filings with the FARA Unit. These

filings require registrants to report, among other things, (1) any changes in the nature and method

11

of performance of the registrant's agreement with the foreign principal, (2) all disbursements or expenditures of money in connection with the registrant's activity on behalf of the foreign principal, and (3) any political activity engaged in on behalf of the foreign principal, including the relations, interests, and policies that the registrant sought to influence and the means employed to achieve these goals. In addition, FARA requires any informational materials disseminated to two or more persons in the United States for or in the interests of a foreign principal to be filed with the FARA Unit and to bear a conspicuous statement that they were distributed by the agent on behalf of the foreign principal. Once submitted to the FARA Unit, supplemental filings and informational materials are likewise published publicly on www.fara.gov.

14.     FARA contains certain exemptions from registration. Relevant to the Company A campaign, FARA's humanitarian exemption provides:

> The requirements of section 612(a) of this title shall not apply to the following agents of foreign principals:
>
> **(d) Private and nonpolitical activities; solicitation of funds**
>
> Any person engaging or agreeing to engage only … (3) in the soliciting or collecting of funds and contributions within the United States to be used only for medical aid and assistance, or for food and clothing to relieve human suffering, if such solicitation or collection of funds and contributions is in accordance with and subject to the provisions of subchapter II of chapter 9 of this title, and such rules and regulations as may be prescribed thereunder.

22 U.S.C. § 613(d)(3).

**The Lobbying Campaign**

*Avenue Strategies Obtains a Contract with Country A; BENNETT Proposes an
Influence Campaign to Benefit Country A*

15.     On or about July 17, 2017, BENNETT met with officials from Country A and

thereafter caused Avenue Strategies to enter into a contract with the Embassy of Country A, located

in Washington, D.C. The Embassy of Country A was part of the Country A's government, which

was a "foreign principal," under FARA. The contract included a fee of $150,000 per month.

BENNETT signed the contract on behalf of Avenue Strategies. The contract was timely filed with

the Department of Justice.

16.     On or about July 24, 2017, BENNETT caused Avenue Strategies to file its FARA

registration documents with the FARA Unit. At that time, Company A did not exist.

17.     On or about July 24, 2017, BENNETT sent an email to a U.S.-based Country A

government official ("Country A Official 1") regarding "proactive measures" to be taken on behalf

of Country A. BENNETT wrote that he was concentrating on "four areas of weakness that might

be particularly useful in changing the debate," one of which he described as the "Situation in

[Country C]." BENNETT described the organization "[Country C] WATCH" [Company A] as an

organization "created to bring attention to the humanitarian and health crisis occurring as a result

of the [Country B/Country D] blockade in [Country C]." BENNETT described the operations of

Company A as follows:

> The entity would publish a report each day on the suffering and
> encourage the United States Government to do more to end the
> suffering caused by [Country B/Country D]. Through use of social
> media and digital advertising the organization would seek 100,000
> Americans to sign a petition asking the President and Congress to
> insist [Country B/Country D] stop their campaign and end the
> suffering. The organization may consider some television
> advertising to encourage Americans to stand with the children in
> [Country C] and against the brutal policies of [Country B].

13

18.     On or about July 25, 2017, BENNETT sent an email to Country A Official 1 with the message: "Plan for Human Rights violations in [Country C]." BENNETT attached a document that "outline[d] a plan to highlight the suffering currently taking place in [Country C] as a result [of] the [Country B/Country D] military intervention in [Country C]." BENNETT proposed that the organization would "highlight the atrocities taking place in [Country C] at the hands of [Country B/Country D]" and that the entity would be based in New York and managed by WATTS. BENNETT wrote that a "budget of $350,000 per month would be sufficient." BENNETT also proposed the involvement of three other individuals, all of whom ultimately worked on Company A. BENNETT closed the memorandum about Company A by writing that he (*i.e.*, BENNETT) "would manage the entire project quietly."

*BENNETT Accuses a Country B Campaign of FARA Violations*

19.     Around the same time that BENNETT was proposing Company A to Country A, BENNETT was also working on behalf of Country A to discredit a Country B-backed third-party activist entity by claiming in writing to the FARA Unit and publicly that the third-party activist entity was acting as a paid agent of Country B and should be required to register under FARA.

20.     On or about August 20, 2017, BENNETT caused Avenue Strategies to deliver to the FARA Unit the press release and the FARA complaint letter signed by BENNETT. BENNETT also caused Avenue Strategies to disseminate the letter to the media. In the letter, BENNETT noted that Country B Lobbyist had not registered under FARA. BENNETT urged DOJ to investigate "the recent dissemination of 'informational materials' by [Country B Lobbyist]" to determine "the true nature of the relationship between" Country B and Country B Lobbyist, whether Country B Lobbyist was "subject to FARA's disclosure requirements" and "what federal laws might have been violated." The FARA complaint letter and accompanying materials were labeled as

14

"informational materials" as required by FARA, and the dissemination of the materials to the media was in accordance with FARA regulations. Avenue Strategies filed the letter and press release as "informational materials" under its own FARA registration for work on behalf of Country A and submitted copies to the FARA Unit, as required by FARA.

### BENNETT and WATTS Create Company A for and in the Interests of Country A

21.     On or about August 28, 2017, BENNETT sent an email to WATTS. The email had no subject or message, but it attached the "[Country C] Watch" [Company A] document—on Avenue Strategies letterhead—that BENNETT had originally sent to Country A Official 1 on or about July 25, 2017 (described in paragraph 18). The proposal identified WATTS as one of four people who would be "involved in the entity," while BENNETT would "manage the entire project quietly." As with the proposal BENNETT sent to Country A, this proposal stated that a budget of $350,000 per month would be sufficient for "spreading the word throughout US Policy Makers of the struggles going on in [Country C] at the hands of [Country B and Country D]."

22.     On or about August 29, 2017, BENNETT created a draft document that contained a false story about his relationship with Company A. In the document, BENNETT described Company A as a non-governmental organization run by WATTS. BENNETT also claimed to have "received a request for a contribution" that he was "considering."

23.     On or about August 30, 2017, BENNETT emailed WATTS, stating, "Send me letter asap." In response, on or about the same day, WATTS emailed BENNETT a letter on Company A letterhead that repeated BENNETT's false story about his relationship to Company A. Even though BENNETT had sent a description of Company A to WATTS two days earlier, the letter from WATTS to BENNETT purported to "introduce" BENNETT to Company A and its mission. Among other things, WATTS described Company A as an organization "committed to

highlighting the suffering currently taking place in [Country C] resulting from [Country B/Country D] military intervention" and intending to "effectively communicate the atrocities taking place in [Country C] at the hands of [Country B/Country D]." In the letter, WATTS purported to request "a major contribution from Avenue of $1.5 million toward our operating budget, and $1.0 million to fund the associated strategic advertising program." WATTS explained that the money would be used to "reach opinion leaders and a public audience sympathetic to the plight of [Country C]." WATTS then wrote that he was "at [BENNETT's] disposal to further detail our plans and answer any questions you may have about our organization and program."

24.     On or about September 5, 2017, Avenue Strategies amended its contract with Country A. The amendment, signed by BENNETT, increased the payments under the contract to $500,000 per month (from $150,000 per month). The increased budget of $350,000 was the same "budget" that BENNETT had proposed to Country A Official 1 on or about July 25, 2017, in the letter that suggested the creation and use of Company A, as discussed in paragraph 18.

25.     On or about September 5, 2017, BENNETT emailed Person B, a public relations consultant whom BENNETT had originally identified as a potential member of Company A in the Company A email described in paragraph 18. In the email, BENNETT asked Person B if he had "a chance this week to talk about a new client of mine regarding raising awareness about the suffering in [Country C]."

26.     On or about September 6, 2017, BENNETT emailed WATTS and an attorney at Law Firm A ("Attorney A"). In the email, BENNETT stated, "[WATTS] meet [Attorney A]. [Attorney A]'s firm is setting up [Company A]. You will be the owner. Best if I don't. He will need your signature."

16

27.     On or about September 6, 2017, WATTS caused Company A to be formed as a Delaware LLC. The company's limited liability company declaration was signed by WATTS, who was listed as its sole member.

28.     On or about September 11, 2017, BENNETT forwarded to WATTS a 13-page proposal from Person B's assistant, with a suggestion that BENNETT and WATTS discuss it. The attached proposal stated that it had been based on a "briefing" by BENNETT and WATTS on September 8, 2017. The proposal included "[d]rafting and arranging Op-eds in major media to explain the dire state of affairs in [Country C] to the reading public" and "[d]evelopment of . . . tweets to communicate the campaign's main messages and counter negative messaging" and "outlined the need for a public information campaign in New York and the United States aimed at developing a sense of outrage about the continuing violence, disease and atrocities in [Country C]." The proposal promised, in part, to "ensur[e] that [Country A]'s voice is heard and heard clearly and loudly in TV debates on [Country C.]"

29.     On or about September 13, 2017, WATTS sent four proposed logos for Company A to BENNETT and asked for his preference. On or about the same day, BENNETT responded, "Want to see sick kids."

30.     On or about September 14, 2017, WATTS sent an email to BENNETT and attached photos of children who appear to be severely malnourished. In the email, he wrote, "you want sick kids and misery?" BENNETT responded, "Wow. Coming to New York tonight to meet with [Country A official] in the morning. Will call after." This meeting was related to BENNETT's duties for Country A regarding the United Nations.

31.     On or about September 14, 2017, Avenue Strategies received a payment of $350,000 from Country A—the same amount that BENNETT had suggested as a monthly operating budget for Company A.

32.     On or about September 15, 2017, at approximately 7:33 a.m., WATTS emailed BENNETT and attached a media plan for Company A. In the email, WATTS wrote, in part, "perhaps this will motivate ad funding action today. If we want this plan activated Monday, I need to transfer funds today."

33.     On or about September 15, 2017, at approximately 10:15 a.m., BENNETT met with a U.S.-based Country A government official ("Country A Official 2"). Later that same day, BENNETT directed an Avenue Strategies employee ("Avenue Employee") to transfer $100,000 to Company A. Bank records reflect that the transfer was made the same day.

34.     On or about September 18, 2017, BENNETT caused Avenue Strategies to file a supplement to its FARA registration. Avenue Strategies attached an amendment to its agreement, signed September 5, 2017, pursuant to which Country A would pay Avenue Strategies $500,000 per month (increased from $150,000 per month). The description of Avenue Strategies' work was unchanged except for the addition of one sentence: "Registrant will also provide strategic public relations consulting and consult on promoting the Image of the State of [Country A]." This statement did not disclose BENNETT's and Avenue Strategies' involvement in Company A.

### Company A Wages a Campaign to Influence the U.S. Government and the American Public

35.     On or about September 15, 2017, WATTS emailed BENNETT a link to a website for Company A, noting, "Placeholder page LIVE! Sick kids pics in queue when full [social media] site is posted."

36.      On or about September 20, 2017, after Person B emailed BENNETT with a request to conduct polling of American sentiment concerning Country B and Country A, writing that he wanted to do this to "ensure that anything that is done in the New York area works for your client," BENNETT responded within minutes that he had a "meeting at 8 tonight" and would "suggest this course [and] report back after."

37.      On or about September 21, 2017, BENNETT directed Person B to go forward and to "send me an invoice to [Company A] attention [WATTS]."

38.      On or about September 21, 2017, WATTS emailed BENNETT a memorandum that reported on "[social media company] Development and Reach" by Company A. The memorandum stated, in part, that BENNETT had asked about the impact of Company A's [social media company] program and its potential for growth through December 2017. WATTS reported that the [social media company] program had "launched just one week ago" but had already obtained 30,000 "likes" and had a "total reach" of 725,000 individuals and anticipated additional growth based on an investment of $20,000 per month.

39.      On or about September 26, 2017, BENNETT caused Avenue Strategies to transfer $50,000 to Company A's bank account.

40.      On or about September 28, 2017, BENNETT directed WATTS to post links to four news articles about the conditions in Country C to one of Company A's social media pages—one every four hours.

41.      On or about October 5, 2017, WATTS emailed BENNETT the website address for Company A's website.

42.      On or about October 12, 2017, Avenue Strategies received a payment of $500,000 from the Embassy of Country A—the first payment under the amended contract.

19

43.     On or about October 16, 2017, approximately two hours after Avenue Employee sent BENNETT a draft invoice to Country A for $250,000 for "documentary" services, BENNETT caused Avenue Employee to send BENNETT the same invoice, this time edited to remove the reference to the "documentary."

44.     On or about October 16, 2017, BENNETT sent to the Embassy of Country A an invoice for $250,000 for "Strategic Consulting" (without any reference to a "documentary").

45.     On or about October 16, 2017, BENNETT caused Avenue Strategies to transfer $100,000 to Company A's bank account.

46.     On or about October 20, 2017, BENNETT caused Avenue Strategies to transfer $125,000 to the Company A account as "Payment for [TV Producer]."

47.     On or about October 20, 2017, WATTS caused Company A to transfer $125,000 to TV Producer for a documentary-style program concerning "volunteer tourism" to be produced by TV Producer, described below in paragraph 58.

48.     On or about October 27, 2017, BENNETT emailed himself a one-page document, which was a memorandum from WATTS to BENNETT on Company A letterhead. The memorandum reported on Company A's progress in generating social media followers, activity, and attention. That same day, Avenue Strategies transferred $101,700 to Company A's bank account.

49.     On or about November 3, 2017, Avenue Strategies received a payment of $500,000 from Country A—the second payment under the amended contract.

50.     On or about November 18, 2017, BENNETT was copied on an email to WATTS about a briefing on Capitol Hill regarding the Humanitarian Crisis in Country C.

51.     On or about November 21, 2017, a newspaper in Washington, D.C. published an opinion piece authored by a spokesperson for Company A (the "Spokesperson"). The opinion piece addressed the humanitarian crisis in Country C and described the impact on children, including that over 1,000 children had been killed and two million children were malnourished and at risk of dying. The opinion article encouraged political action by readers.

52.     On or about November 21, 2017, BENNETT sent to Person C, an associate who had connections to one or more high-level Country A officials, a link to the opinion piece described in paragraph 51 above, stating, "it's up[.]"

53.     On or about November 28, 2017, BENNETT provided Person C with a document on Avenue Strategies letterhead that highlighted "a few key areas" of Avenue Strategies' "work for Country A." The document reported that Avenue Strategies' "first attempt at playing offense is going very well." It claimed that Company A was "the largest organization of its kind focused on Country C with over 125,000 [social media company] fans" and touted several of Company A's other activities, including publishing an opinion article by Spokesperson, working with a national public television network on an hour-long special, and "help[ing] [to] organize a number of protests around Washington directed at the [Country B] and [Country D] Ambassadors." In the document, Avenue Strategies claimed credit for lobbying U.S. government officials:

> We directed over three thousand phone calls to the House of Representatives encouraging them to cast a vote to end the US involvement with the [Country B/Country D] Coalition and end the blockage and begin to ease the crisis. The House overwhelmingly voted to "DeAuthorize" US involvement in a major win for those of us trying to end the crisis.

54.     On or about December 1, 2017, BENNETT caused Avenue Strategies to transfer $96,500 to Company A's bank account.

21

55.    On or about December 7, 2017, Avenue Strategies received a payment of $500,000 from Country A—the third (and what would be the final) payment under the amended contract. That same day, BENNETT received an emailed invitation to the Capitol Hill briefing discussed in paragraph 59.

56.    On or about December 8, 2017, BENNETT emailed a representative of the White House with a letter signed by the Spokesperson. The attached letter was on Company A letterhead and was addressed to the then President. Among other things, the letter claimed that Country C was "mired in a vicious civil war and strangled by a blockade conducted by [Country B], [Country D], and other countries." The letter also implored, "I hope the leadership of [Country B] will heed your call to lift their coalition's blockade and allow food, fuel, water, and medicine" to reach Country C.

57.    On or about December 11, 2017, BENNETT sent a video to Person C with the message, "[o]ur protests today in front of [Country B] Mission." The video depicted a protest, including one person holding a sign that read, "STOP US [Country B] WAR CRIMES IN [Country C]."

58.    On or before December 11, 2017, WATTS participated in an interview for a documentary-style program concerning "volunteer tourism" that was produced by TV Producer. In the final version of the program, which was distributed through a national public television network and published online, WATTS described the work of Company A as follows:

> Our organization . . . is all about raising awareness. We don't raise money for ourselves, we don't provide relief on the ground in [Country C]. We are trying to raise awareness of what this crisis is and the scope of it is.

WATTS emphasized that "raising awareness" meant "talking to your friends, talking to your representatives in Congress, making sure we elevate this issue to a point where everybody feels responsible to get involved [and] donate to one of the organizations that do provide relief."

59.     On or about December 14, 2017, Company A conducted a briefing on Capitol Hill concerning the humanitarian crisis in Country C. WATTS and Spokesperson led the briefing, which Congressional staffers attended.

60.     On or about December 15, 2017, BENNETT caused Avenue Strategies to transfer $125,000 to Company A's bank account.

61.     On December 15, 2017, WATTS caused Company A to transfer $125,000 to TV Producer as the second payment for the documentary described above in paragraph 58. In total, TV Producer received $250,000 from Company A—the same amount paid by Country A to Avenue Strategies in response to the October 16, 2017 invoice. The $250,000 payment from Country A to Avenue Strategies was described in Avenue Strategies' FARA filing dated March 2, 2018, as follow: "As a supplement to the Addendum dated Sept. 5, 2017, the foreign principal would provide an additional $250,000 in October 2017 for use in supporting the relief of humanitarian suffering in Yemen."

62.     On or about December 25, 2017, Spokesperson published a second opinion article in a Washington, D.C. newspaper calling for an end to the blockade in Country C. The opinion article emphasized Country B's role in the matter, stating, in part, "[r]ecently, a dire situation has become worse. [Country B], which leads a military coalition that includes [Country D], [two other countries], and other regional countries, enforced a near-complete blockade of [Country C] last month." The opinion urged readers to "call on members of Congress" and the international community to exert pressure to end the war.

***Country A Ends Company A***

63.     On or about January 4, 2018, BENNETT texted Person C that he was "headed over to embassy shortly." Later that day, BENNETT told Person C, "They are going to stop the [Country C] project."

64.     On or about January 16, 2018, BENNETT directed Avenue Employee to prepare an addendum to the Country A contract to reset the price to "$150,000 per month for a year." This amendment served to return the contract to its original price before the operation of Company A, *i.e.*, $150,000 per month.

65.     On or about January 16, 2018, BENNETT caused Avenue Strategies to transfer $75,000 to Company A's bank account.

66.     On or about January 19, 2018, Avenue Strategies received a payment of $150,000 from Country A, which reflected a return to the original fee schedule under the July 2017 agreement between Avenue Strategies and the Embassy of Country A.

67.     On or about February 16, 2018, WATTS emailed BENNETT with a summary of the "[Social Media Company] Campaign" that had been conducted by Company A. The summary noted: 25.7 million "marketing impressions," 16.4 million "unique individuals reached," 148,000 [social media company] page followers, and 487,000 total "actions taken on page."

**Avenue Strategies Submitted FARA Filings Containing
Numerous Material Omissions**

68.     On or about March 2, 2018, BENNETT caused Avenue Strategies to file a
Supplemental Statement and Exhibit B to Avenue Strategies' FARA registration. BENNETT
signed the Supplemental Statement and Exhibit B under penalty of perjury on behalf of Avenue
Strategies on or about February 28, 2018, and February 29, 2018, respectively. Although these
documents disclosed work by BENNETT and Avenue Strategies on behalf of Country A on other
matters, they did not disclose the creation of Company A, Avenue Strategies' and BENNETT's
affiliation with Company A, Avenue Strategies' disbursements to Company A, WATTS's work
on behalf of Company A and Country A, or any of Company A's FARA-registrable activities.

69.     In the Supplemental Statement signed by BENNETT and filed with the FARA Unit
on or about March 2, 2018, BENNETT failed to include any reference to any Company A
employees or contractors. In response to a question asking if Avenue Strategies had "hired as
employees or in any other capacity, any persons who rendered or will render services to the
registrant directly in furtherance of the interests of any foreign principal(s) in other than a clerical
or secretarial, or in a related or similar capacity," Avenue Strategies failed to list WATTS or any
other Company A employees.

70.     In the Supplemental Statement signed by BENNETT and filed with the Department
of Justice on or about March 2, 2018, BENNETT omitted any reference to the political activities
engaged in by Company A during the six-month period between July 31, 2017, and January 31,
2018. In response to a question that required Avenue Strategies to report any "political activity"
on behalf of the Embassy of Country A and directed Avenue Strategies to "describe in full detail
all such political activity, indicating, among other things, the relations, interests and policies sought
to be influenced and the means employed to achieve this purpose," as well as all details of events

25

where the "registrant arranged, sponsored or delivered speeches, lectures or radio and TV broadcasts," BENNETT failed to list any activities by Company A. In particular, BENNETT omitted any description of or reference to: (1) Avenue Strategies' involvement in arranging the Company A briefing on Capitol Hill; (2) BENNETT's submission of Spokesperson's letter to the then President; (3) WATTS's and Company A's participation in the filming of the documentary; (4) Spokesperson's opinion pieces published in the Washington, D.C. newspaper; (5) Avenue Strategies' efforts to encourage Americans to call members of Congress as part of a "grassroots" lobbying campaign; (6) Avenue Strategies' organization of one or more protests in Washington, D.C.; and (7) all other political activities conducted by Company A, including on its website and via social media, that were designed to influence the American public and the U.S. government to benefit Country A.

71.     In the Supplemental Statement signed by BENNETT and filed with the Department of Justice on or about March 2, 2018, BENNETT omitted any reference to disbursements made by Avenue Strategies to Company A during the six-month period between July 31, 2017, and January 31, 2018. In response to a question that required that Avenue Strategies report any disbursements "in connection with activity on behalf of" the Embassy of Country A, BENNETT omitted any reference to the more than $773,000 that Avenue Strategies paid to Company A in furtherance of its activities on behalf of the Embassy of Country A, including the $250,000 paid to TV Producer for WATTS's appearance in the documentary.